IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELVINA SMITH and DANTE SMITH, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 21-CV-00890 ) ) Honorable John Robert Blakey |
| THE CITY OF CHICAGO, et al., | ) ) |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Melvina Smith ("Melvina") and her son Dante Smith ("Dante") sue the City of Chicago ("City") and numerous Chicago police officers alleging civil rights and state law violations in connection with the Officers' search of Plaintiffs' apartment. The Officers move to dismiss all counts against them and to strike certain allegations [29], and the Defendant City moves to dismiss Dante's *Monell* claim (Count I) [31]. For the reasons discussed below, the Court grants in part and denies in part both motions.

**I.     Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raises a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2019). Importantly, it tests the sufficiency of the complaint, not the merits of the case. *See Givson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A court must accept as true all well-pled factual

1

allegations; it need not accept mere legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## II.  Background[1]

On the evening of July 1, 2017, Defendant Chicago Police Officer Bonstetter presented a Complaint ("Warrant Complaint") to a Chicago judge seeking a search warrant for a second-floor apartment at 3910 West Van Buren to find Kevin Stuart, (aka "Kevo") and seize heroin, residency documents, and materials evidencing illegal drug transactions. [28] ¶¶ 42–43. According to the Warrant Complaint, a John Doe informant had told Officer Bonstetter the day before that "Kevo" sold him heroin from this apartment that same day and had sold him heroin from that apartment for over two months. [29-1] at 2.[2] Officer Bonstetter took the following steps to corroborate the John Doe's statements: (1) he searched the police database for mug shots for a "Kevin Smith" and showed it to John Doe, who positively identified the photo as "Kevo"; and (2) he drove John Doe past 3910 West Van Buren to confirm it was the building where Doe purchased heroin from "Kevo". *Id*. According to the Warrant Complaint, Officer Bonstetter also presented John Doe to the judge, along with John Doe's "criminal history including possible pending investigations, if any," and then

---

[1] The Court draws the facts from the Plaintiffs' Amended Complaint, [28], which it will refer to as the "Complaint."

[2] Plaintiffs discuss the Warrant Complaint in the Complaint, [28] ¶¶ 43–49, and Officers attached it to their Motion to Dismiss, [29-1]. As a result, and because Plaintiffs did not object, the Court may properly consider it. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (court may consider materials incorporated by referenced in a complaint in deciding a motion to dismiss under Rule 12(b)(6)).

John Doe "swore to the contents of the complaint and was made available for questioning." *Id*.

After review of those materials and presentation of John Doe himself, the judge issued the search warrant, and later that evening Defendant Officers Marvin Bonstetter, Michael Bertini, Wayne Frano, Nicholas Hertko, Ivan Ramos, Kevin Garcia, Michael Napoli and Salvatore Reina (hereinafter, "Officers")—armed with assault rifles, handguns and bright lights—executed the warrant at the multi-unit apartment building where Plaintiff Melvina Smith lived with her minor son, Plaintiff Dante Smith, and others. [28] ¶ 57. Melvina, hearing the commotion, opened her second-story apartment door to see what was happening. [28] ¶ 58. Seeing the Officers with their guns drawn and aimed at her, she immediately put her hands up and backed into her apartment. *Id*. ¶ 59. The Officers streamed in the front door while other officers simultaneously entered through the apartment's back door. *Id*. ¶¶ 59–60. Officers Reina and Frano, with their weapons trained on her, screamed "Get on the F---ing ground!" *Id*. ¶ 61.

At the time, Melvina's sixteen-year-old son, Dante, was in his room. *Id*. ¶¶ 10, 62. Hearing the ruckus, he came out to see what was happening. *Id*. When he reached the front of the house, the Officers turned their weapons on him, repeatedly screaming "Don't F--- move!" and "Get Down"; Dante immediately put his hands up. *Id*. ¶¶ 62–63. An officer (believed to be Officer Ramos) grabbed and twisted Dante's left arm, pushed him against the wall, handcuffed him, and ordered him to sit down. *Id*. ¶ 64. Officer Ramos then held his gun to Dante's cheek and threatened, "[i]f you

3

want to keep playing basketball, don't F------ move or I'll blow your brains out." *Id.* ¶ 65. Dante, crying, sat down, and Officer Ramos pressed his knee and gun into Dante's back. *Id.* The police also handcuffed Melvina's other son, Martez, body-slamming him to the floor and grabbing him by his dreadlocks. *Id.* ¶ 71.

The Officers also handcuffed Melvina and allegedly abused her, grabbing her painfully by the back of the neck after allegedly handcuffing her, screaming and spitting in her face, choking her, pushing her, and then throwing her down the entrance stairs. *Id.* ¶¶ 67, 72.[3] After handcuffing Melvina, Officer Reina also allegedly stuffed the warrant down her shirt, saying "here's your f------ search warrant." *Id.* ¶ 69.

While the police searched the apartment for the next hour, Dante and Martez sat handcuffed on the floor along with the apartment's other occupants, some of whom were also children.[4] *Id.* ¶ 66. Even though Dante and the other minor children did not pose an active threat, certain officers kept their guns drawn and pointed at Dante (and possibly others) for the entire hour. *Id.* Dante and the other minors watched as the Officers screamed, shouted, and cursed at their loved ones, threatening them and treating them like criminals and animals. *Id.* ¶¶ 66, 70, 96. After an hour of searching, the Officers—having found neither "Kevo" nor anything listed in the

---

[3] The Complaint describes, in detail, what happened to Melvina after the officers took her out of the apartment. *See* [28] ¶¶ 73–78. But the Court omits these allegations because she has not asserted a claim for damages from this encounter, and, as discussed below, she concedes that any such state law claim is time-barred. [42] at 17.

[4] The Complaint alleges that the Officers handcuffed the other minors but does not indicate whether there were also non-minor occupants on the floor and, if so, whether the officers handcuffed them, too. *See* [28] ¶ 66

search warrant[5]—left, leaving the apartment in total disarray, with food thrown around the kitchen, couches sliced open, beds and bedframes broken, and floorboards dug up. *Id.* ¶¶ 81–88. The Officer never apologized to Dante or the apartment's other occupants, but instead remained sarcastic, rude, profane, disrespectful, and cocky throughout the encounter. *Id.* ¶ 89. Melvina later called the Civilian Office of Police Accountability ("COPA") to complain, but COPA allegedly never investigated her complaint. *Id.* ¶ 90.

More than three and a half years later, on February 17, 2021, Melvina Smith and Dante Smith sued the City of Chicago ("City") and the Officers who participated in the search warrant execution, as well as Officers Q.Q. Jefferson, A.D. Thompson and L.D. Clark who were at the station where officers brought Melvina after arresting her. Dante brings § 1983 claims against the Officers for unlawful search/invalid search warrant (Count II) and false arrest/imprisonment (Count III) and various state law claims (Counts IV–VII). He also brings a § 1983 *Monell* claim (Count I) against the City. Both Melvina and Dante also bring a state law claim for conversion of chattels/destruction of personal property (Count VIII) against the Officers and *respondeat superior* and indemnification claims (Count IX–X) against the City.

### III. Analysis

The Officers seek dismissal of all claims against them. [29]. They argue that: (1) there existed probable cause to search Plaintiffs' apartment (Count II); (2) they are entitled to qualified immunity for the search (Count II) and detention (Count III);

---

[5] The Officers argue that they uncovered illicit drug materials. [63] at 4 n.2. But the Court must take as true a complaint's factual allegations in deciding a motion to dismiss. *See Ashcroft*, 556 U.S at 679.

and (3) Plaintiffs' state law claims are untimely (Counts IV-VIII). They also ask the Court to strike certain allegations as inflammatory and irrelevant to Plaintiffs' claims. The City moves to dismiss Dante's *Monell* claim (Count I). [31].

The Court first considers the Officers' motion to dismiss the state law claims (Counts IV–VIII) and their motion to strike. It then turns to the Officers' arguments regarding Dante's constitutional claims (Counts II and III). Finally, it considers the City's motion to dismiss the *Monell* claim (Count I).

### A. Plaintiffs' State Law Claims and the Motion to Strike.

The Officers argue that Plaintiffs' state claims, filed on February 17, 2021, are untimely. [29] at 12–15. They claim that a 1-year statute of limitations controls, which, for Melvina, began to run on July 1, 2017, when the officers executed the search; and, for Dante, began to run when he turned eighteen in late February 2019.[6] *Id*. In response, Plaintiffs concede that their state law claims are untimely. [42] at 16. Accordingly, the Court grants the Officers' motion to dismiss Counts IV–VIII. Further, because Plaintiffs' state law claims fail, Plaintiffs cannot maintain *respondeat superior* and indemnification claims (Counts IX, X) against the City. Those, too, are dismissed.

---

[6] The Officers state that Dante turned eighteen on February 17, 2019 and therefore he had to file a claim by February 17, 2020. [29] at 13. The Complaint does not give Dante's exact date of birth, but instead states that he "reached the age of majority in late February 2019." [28] ¶ 110. The exact date, however, is immaterial to the Officers' statute of limitations defense to the state law claims, because Dante did not file his claims until two years after he turned eighteen. [1]. But, as the City points out in its motion, if Dante's exact birth date was prior to February 17, 2019, then this may raise a timeliness issue for his § 1983 claims (Counts I–III). [31] at 2 n.1. No party moves to dismiss Dante's § 1983 claims on this basis (the City only reserved the right to argue timeliness in the future), so the issue is not ripe for the Court to consider.

The Officers also seek to strike paragraphs 59, 61, and 68–78 of the Complaint, arguing that they relate to Melvina whose claim is time-barred and, regardless, are inflammatory and not relevant to any claims. [29] at 15.

Paragraphs 73–78 relate to what allegedly happened to Melvina after the Officers took her out of her apartment on July 1, 2017. [28] ¶¶ 73–78. They are indeed inflammatory. *Id*. Melvina, however, did not bring any claims regarding what allegedly happened to her during that period. She only brought an untimely conversion/property damage claim relating to the search (Count VIII). *Id*. ¶¶ 206–10. Accordingly, the Court grants the Officers' motion to strike these irrelevant and inflammatory paragraphs.

On the other hand, paragraphs 59, 61, and 68–72 allege what occurred in the apartment during the search. *Id*. ¶¶ 59, 61, 68–72. Some of these paragraphs allege what the Officers did to Melvina in the apartment, *see id*. ¶¶ 59, 61, 68–69, 72, while others discuss how the officers treated the apartment's other occupants individually or collectively, *see id*. ¶¶ 70–71. Further, paragraphs 59, 61, and 68–72 detail how the Officers entered the home, and what happened in the room where Dante sat handcuffed on the floor. They describe the nature of the search and support Dante's allegation that he suffered emotional and psychological distress in part because Officers subjected him to "screaming, shouting, cursing at and threatening [him] and [his] loved ones." [28] ¶ 97. Therefore, the Court denies the Officers' motion to strike the allegations contained in paragraphs 59, 61, and 68–72.

Finally, the Officers also argue that the Court should dismiss Officers Jefferson, Thompson, and Clark because they only interacted with Melvina Smith in the police station following her arrest and she concedes her sole claim is untimely. [63] at 2; *see also* [28] ¶ 14. The Court agrees. Although Plaintiffs generally allege that "the defendant officers" assisted Officer Bonstetter in the search warrant investigation, [28] ¶ 44, they do not allege that Officers Jefferson, Thompson or Clark sought the warrant or executed the search. In fact, paragraphs 73–78 contain the only substantive allegations relating to these officers, which the Court has properly stricken. Plaintiffs fails to assert claims against Officers Jefferson, Thompson, and Clark; accordingly, the Court dismisses them.

### B. Probable Cause as to the Alleged Unlawful Search (Count II)

Plaintiff Dante Smith alleges that the Officers sought and executed an invalid search warrant in violation of his Fourth Amendment rights. In moving to dismiss, the Officers argue that the Warrant Complaint, which the judge relied upon to issue the search warrant, demonstrated probable cause. [29] at 3–8. The Officers rely heavily on *Edwards v. Jolliff-Blake*, 907 F.3d 1052 (7th Cir. 2018), where the Seventh Circuit affirmed probable cause based upon an affidavit facially similar to the Warrant Complaint in this case. [29] at 6; [63] at 6–7.

In response, Dante argues that, even if the search warrant had facial validity, the Complaint sufficiently alleges an unlawful search clam because the Officers knew or reasonably should have known that "Kevo" did not reside at Plaintiffs' address and

8

that the Warrant Complaint was "materially inaccurate and incomplete." [28] ¶¶ 44, 55.

The Seventh Circuit has held that, even if there exists a facially valid warrant, officers may still violate a person's Fourth Amendment rights if they execute a search warrant knowing "that the warrant was not supported by probable cause." *Juriss v. McGowan*, 957 F.2d 345, 351 (7th Cir. 1992). Such a claim may be shown through evidence that the officers "knowingly or intentionally or with a reckless disregard for the truth" sought or executed the warrant. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). The term "reckless disregard for the truth" means "the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp*, 320 F.3d at 743. The Supreme Court has held that the extent of an officers' duty to discover information to support a warrant depends upon what "the officers had known" or "should have known" at the time they sought the warrant. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).

The Complaint here makes a conclusory assertion that the Officers knew or reasonably should have known that "Kevo" did not reside at the Plaintiffs' addresses, but it fails to support this contention with facts or otherwise explain how Officers allegedly knew (or should have known) that "Kevo" resided elsewhere. It also fails to identify any facts contained in the Warrant Complaint that would undermine the Judge's finding regarding probable cause and John Doe's credibility.

9

Instead, the Complaint alleges that the Officers acted with "reckless disregard for the truth" because they failed to independently corroborate the John Doe's statements. [28] ¶¶ 44–51, 53. The law, however, imposes no requirement that police independently corroborate every statement made by an informant in support of a John Doe warrant. Indeed, the Seventh Circuit has held that even if the "police's failure to corroborate the informant's claim was negligent, a little negligence—actually even a lot of negligence" does not suffice to show a constitutional violation. *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009); *see also Pressley v. Brownfield*, 1994 WL 702648 (N.D. Ill. Dec. 14, 1994) (dismissing an unlawful arrest claim because the complaint did not identify any deliberate falsehoods in the warrant affidavit or present evidence of reckless disregard, but instead "claim[ed] that [the officer] was negligent in failing to conduct a thorough investigation.").

Here, the Complaint's allegations (in conjunction with the Warrant Complaint itself) fail to undermine the existence of probable cause, or otherwise support any inference of the requisite reckless disregard by the Officers. Dante does not allege that Officer Bonstetter (or any other officer) knew any facts to suggest that the John Doe's story was unreliable or incredible. Further, the Warrant Complaint confirms that Officers Bonstetter drove the John Doe past the Plaintiffs' residence to verify the identification. [29-1]. It also states that Officer Bonstetter showed John Doe a mugshot of "Kevo" who positively identified it as the individual who sold him heroin from Plaintiffs' address. *Id*. Further, the Warrant Complaint confirms that Officer Bonstetter presented John Doe (and John Doe's criminal background) to the issuing

10

Judge who had the opportunity to question him and test his credibility. *Id.* Contrary to Dante's conclusory assertions, the Complaint's allegations (which incorporate the Warrant Complaint) confirm the good-faith efforts of the police.

Accordingly, Dante has not pled a plausible unlawful search claim and the Officers are entitled to dismissal on Count II. The dismissal is without prejudice, however, and Dante may move to amend if he discovers facts about the Officers' knowledge or other conduct that actually substantiate an unlawful search claim, consistent with the obligations of Rule 11.

### C. Qualified Immunity (Counts II & III)

The Officers next argue that they are entitled to qualified immunity for Dante's invalid search (Count II) and false arrest/imprisonment (Count III) claims. [29] at 9–11. First, Dante's unlawful search claim (Count II) rests solely on his allegation that the Officers lacked probable cause to search his residence. As discussed above, Dante fails to adequately allege the invalidity of the warrant or the absence of probable cause and thus, the Court dismisses Count II without prejudice. Accordingly, the Court need not examine qualified immunity as to Count II.

Turning to the false arrest/imprisonment (Count III) claim, the Officers argue that they are entitled to qualified immunity because officers have authority to handcuff occupants while they execute a search. [29] at 11. They also assert that Dante cannot bring a false arrest claim because he was not arrested; rather, they argue, Dante's claim sounds in excessive force (a claim Dante failed to bring). [63] at 12–13.

First, despite any purported flaws in a false arrest theory, Count III may be construed, at this early stage, to allege a claim for unreasonable seizure and excessive force.[7] *See Archie v. City of Chicago*, No. 19-CV-4838, 2020 WL 5751185, at *5 (N.D. Ill. Sept. 25, 2020) (interpreting a false arrest claim as an unreasonable seizure claim where the plaintiff was not arrested but claimed she was "needlessly handcuffed" during execution of a search warrant); *cf. Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (holding that officers can violate fourth amendment rights by unreasonably seizing a person through excessive force).

Second, qualified immunity shields officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, when considering a qualified immunity defense, the Court contemplates: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). "Clearly established" means that: (1) various courts have found that "certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand;" or (2) the constitutional violation is "patently

---

[7] The Complaint names only one minor Plaintiff—Dante Smith; yet, at times, Count III references "minor plaintiffs" and alludes to the Officers' unlawful deprivation of numerous minor plaintiffs' rights under the Fourth and Fourteenth Amendments. *See, e.g.,* [28] ¶¶ 169–71. The Court considers only the alleged constitutional violations as to the named minor Plaintiff, Dante Smith.

obvious" and "no reasonable [official] could have thought he was acting lawfully." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (internal citations omitted).

The Supreme Court emphasizes that a court should resolve a qualified immunity defense "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224 (1991)). The Seventh Circuit cautions, however, that a motion to dismiss rarely presents "the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) (citing *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001)).

Here, accepting all well-pled allegations as true, the Officers' qualified immunity argument fails at this point in the proceedings. Dante alleges that he and the other occupants (many of whom were minors) posed no threat to the Officers. [28] ¶¶ 66, 91–94. Yet, the Officers pointed guns at Dante's chest and screamed "Don't F----- move" and "get down" when he first came into the front of the apartment, even though they knew he bore no resemblance to the alleged target, Kevo. *Id*. ¶¶ 62–63, 91–93. He alleges that Officer Ramos screamed obscenities at him; twisted his arm behind his back; pushed him against the wall; painfully handcuffed him; and held a gun to his cheek, threatening "if you want to keep playing basketball, don't F------ move or I'll blow your brains out." *Id*. ¶¶ 64–65. Next Officer Ramos made Dante sit handcuffed on the ground, pressing his knee and gun into Dante's back. *Id*. ¶ 65. Dante remained handcuffed for an hour, during which time the Officers pointed guns

13

at him and the apartment's other occupants and spoke to them "as though they were criminals or animals." *Id.* ¶¶ 66, 70. During the search, Dante also watched as the Officers allegedly threatened and hurt his mother and other family members (some of whom were also minors), *id.* ¶¶ 67–72.

Even under the exacting standards for denial of qualified immunity, *see White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating that "clearly established law" should not be defined "at a high level of generality" and must be "particularized" to the facts of the case"), the law had firmly established freedom from unreasonable seizure and excessive force under the circumstances alleged above at the time of the Officers' alleged conduct toward Dante. *See, e.g., McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (finding it should have been obvious to an officer executing a search that it was objectively unreasonable to point a gun at a 9 year-old's head and threaten to pull the trigger); *Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000) (finding unreasonable force where officers pointed a gun at an elderly man's head for ten minutes even though they knew he was not the target of the search and had not resisted officers). Accordingly, based on the current record, the Officers are not entitled to qualified immunity on Count III via a motion to dismiss.

### D. *Monell* Claim Against the City of Chicago (Count I)

The Court now turns to the City's motion to dismiss Dante's *Monell* claim (Count I). [31]. Dante alleges that the City of Chicago had numerous widespread customs or *de facto* policies that directly and proximately caused the Officers to use excessive force against Dante. Namely, Dante alleges: (1) a pattern and practice of

using unnecessary or excessive force against citizens, including children and youth; (2) a failure to have any policy about when officers may draw their guns and point them at citizens, including children; (3) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force; and (4) the absence of an official policy and training for officers to refrain from using excessive or unnecessary force against or in the presence of children. [28] ¶ 112. Dante also alleges a "*de facto* policy of applying for and executing residential search warrants based on inaccurate, unreliable and unverified information." *Id.* ¶ 135.

The City argues that Dante's *Monell* claim fails because the Complaint includes numerous conclusory and unsupported legal assertions that do not sufficiently allege any such city-wide customs or *de facto* policies. [31] at 3–6. While the City acknowledges that the Complaint includes some examples of alleged excessive force (including against minors), the City argues that these examples do not involve execution of a drug-related search warrant and therefore do not plausibly show a *de facto* policy "under like circumstances." *Id.* at 7–9. The City also argues that Dante fails to adequately allege that the City had "actual or constructive notice of a problem" and so Dante fails to adequately plead deliberate indifference. *Id.* at 10. Finally, the City argues that Dante fails to allege causation between any *de facto* city policy and the Officers' actions. *Id.* at 11–13.

A *Monell* claim, like any other claim governed by Rule 8's notice-pleading standard, only requires a plaintiff to plead sufficient facts to allow the court to "draw the reasonable inference that the [local governing body] maintained a policy, custom,

15

or practice,' or a lack thereof that caused the constitutional violations alleged." *Howard v. Sheriff of Cook Cty.*, No. 15-CV-9384, 2016 WL 4366598, at *3 (N.D. Ill. Aug. 16, 2016) (quoting *McCauley v. City of Chi.*, 671 F. 3d 611, 616 (7th Cir. 2011)).

At this early stage, Dante sufficiently pleads the existence of *de facto* policies regarding the use of excessive force against minors. The Complaint includes: (1) the City's alleged systemic failures to address resident complaints, [28] ¶¶ 20, 115–19, 124–34; (2) findings by the DOJ and the Chicago Police Accountability Task Force regarding Chicago police officers' excessive force against children and others in a variety of contexts, *id.* ¶¶ 18–19; (3) the City's response (or lack of a response) to these complaints and findings, *id.* ¶¶ 21–26, 120–23; and (4) the City's knowledge of the trauma children may suffer from violence, *id.* ¶¶ 27–30. These allegations are not merely conclusory but allow the Court to reasonably infer the alleged *de facto* excessive force policies.

The City also argues that, even if Dante provides examples of alleged excessive force against minors, these did not relate to drug-related search warrants, which is significant because police face unique dangers when executing such warrants. [31] at 6. Certainly, this fact informs the reasonableness of the Officers' use of force in this case, but Dante need not narrowly construe the alleged *de facto* policy to cover only execution of drug-related search warrants. It is enough that Dante alleges *de facto* policies that permeate police officers' interactions with minors and provides numerous examples in support. Further, these numerous examples and Dante's allegations about the City's response (or lack thereof) allow the Court to reasonably

16

infer a direct and proximate link between the alleged *de facto* policies and the Officers' alleged excessive force against Dante.

Dante fails, however, to adequately allege a *de facto* policy of "applying for and executing residential search warrants based on inaccurate, unreliable and unverifiable information." [28] ¶ 135; *see also* [31] at 6. In support of this allegation, Dante alleges that: (1) Chicago police execute 1,500–2,000 search warrants per year; (2) they disproportionately execute these warrants in black or latino neighborhoods; (3) over 43 percent of all searches are "negative" (*i.e.* do not result in an arrest or recovery of contraband); (4) the majority of these "negative" searches occurred in predominately black and latino neighborhoods; and (5) many of these searches are "negative" because the officers failed to verify whether the target of the search resides at the location searched. [28] ¶¶ 32–39.

Even if Dante had sufficiently alleged an unlawful search claim as to him, he has not alleged an actual or *de facto* policy of improperly applying for and executing search warrants. Allegation (5) constitutes a conclusory assertion and allegations (1)–(4), even if true, do not support the conclusion. Nor do these allegations imply a *de facto* policy. Even if police disproportionately execute search warrants in black or latino neighborhoods, this fact alone does not constitute a policy to improperly seek search warrants. Further, while it is *possible* that sloppy police work or some *de facto* policy caused "negative" search warrants, Dante fails to demonstrate why this conclusion is plausible. Dante's allegations just invite conjecture about the instances

17

of "negative" search warrants and fail to meet the Rule 8 notice-pleading requirements.

**IV. Conclusion**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss [29], [31]. The Court dismisses with prejudice Plaintiffs' state law claims (Counts IV–VIII), *respondeat superior* claim (Count IX), and indemnification claim (Count X), and strikes paragraphs 73–78 of the Amended Complaint, [28]. The Court also dismisses without prejudice Plaintiff Dante Smith's Unlawful Search claim (Count II); his *Monell* claim (Count I) against the City of Chicago as to the alleged *de facto* policy of "applying and executing residential search warrants based on inaccurate, unreliable and unverifiable information," [28] ¶ 135; and all claims as to Officers Jefferson, Thompson, and Clark. In all other respects, the Court denies Defendants' motions to dismiss [29], [31].

Dated: March 25, 2022

        Entered:

        _____
        John Robert Blakey
        United States District Judge